My name is Joseph Ray, for Monster Energy Company, and I will be addressing the District Court's first error, which is the focus of my argument. The error I'd like to focus on is the District Court's finding, which was the backbone of denying my client permanent relief against an adjudicated infringer of a trademark and of a trade dress, and for committing various acts of unfair competition. The District Court, in the opinion at ER 25, specifically made the finding that Plaintiff Monster does not offer evidence demonstrating that it actually lost control over its business reputation and that its goodwill has actually been harmed. The record is overwhelming to the contrary. I do not believe that the District Court actually understood what control is by a trademark owner. First, I'd like to address what is the asset that we're talking about, and what is control? The asset is the mark Monster, the green and black trade dress. The name Monster is undisputed to be at least a $5 billion asset, and on social media, it is one of the top 10 trademarks in the world, following the likes of Starbucks, Amazon, Nike, and Walmart. There is no question on the famous nature of the mark and the valuable asset that it represents. It is Monster Energy's key asset, but it only can remain that way if there is control over the asset. The entirety of the trial, particularly the testimony from Mr. Rodney Sachs, the CEO and principal founder of Monster Energy, explained in excruciating detail how Monster controls its mark, why that is so necessary. What exactly is control? Control is necessary by any trademark holder who values their trademark. And that means you have a choice to make when you control a trademark. You either sue to prevent unauthorized use, or you license with tight restrictions to preserve the exclusivity of the trademark. Failure to control kills a trademark. This case showed tremendous efforts by Monster both to control by suit and to control by detailed license agreements where numerous restrictions are placed on each and every licensee before they get the privilege of using one of Monster's famous trademarks. What do I mean by restrictions? The record is abundantly clear that restrictions... ...several elements of a test. And one of the things that we know from the jury's verdict is that they did not attribute any monetary harm to what they found to be a clear infringement. And while Monster wants to have control of its trademark, and obviously there was evidence to the extent to which it tried to maintain that control, there have to be situations where a permanent injunction isn't granted, and the case law supports that. And doesn't the jury's verdict that there has been no monetary loss suggest that there's been no harm to the goodwill even though you've lost some control, and therefore you have an adequate remedy at law for any future infringement? No, Your Honor, and for several reasons I disagree with your premise of your question. Number one, this court, the Ninth Circuit, has already held that you do not need actual damages for injunctive relief in a trademark case. That's the Safeway case of 1957 where Safeway food stores successfully enjoined a furniture store that was selling Safeway furniture, even though there was no award of actual damages. The jury simply found that Monster did not prove the amount, the compensable amount of damages. That is a remedy at law. The jury did not decide irreparable harm. Irreparable harm is decided on the entirety of the record, not just the jury trial record, and Judge Marshall so held. So when you decide whether to grant a permanent injunction, the district court is free to look at the entirety of the record because that decision is not the decision that the jury makes. The jury decides only monetary relief. The jury does not concern itself with equitable relief at all. Counsel, I think you're correct about that, but there's no indication here that the district court didn't look at the entire record in determining that a permanent injunction wasn't warranted because there was a lack of showing of irreparable harm. And in assessing irreparable harm, I think the fact that zero award of damages was given by the jury is relevant to that consideration. I don't think the district court limited its analysis to just that, though. Well, I think the district court... In looking at this record, you know, I think it's conceivable that the district judge could have gone the other way, but our standard of view is to determine what this district judge did and whether that's reasonable in light of the record. So focus on the evidence that you think establishes irreparable harm that the district court purportedly missed in its analysis. Yes, the district court did miss it in its analysis. The district court did cite many transcript pages. But in particular, the fear, the fear that was explained to the jury is by Mr. Sachs. And like any good trademark holder, the fear in this case was that the mark would become ubiquitous. So you must control the quantities, the qualities, the licensee, the trade channels before you even think about licensing somebody. This was explained by Mr. Sachs at ER 123 to 124. He says, our greatest fear is that we do not end up in Walmart or Kmart, which dilutes the brand. That is the fear of any good trademark holder who fears the exclusivity of the trademark is lost. It would be lost if we no longer had control. And here we have undisputed, ongoing infringement on both the trade dress, 16 registered trademarks. And we are now at the mercy of a company called Independent Supply Network, who we have never heard of until this litigation. They are a company that is not in the top tool company brands. And in fact, we have relationships with tool companies. That was explained that we have relationships with Stanley Black & Decker and DeWalt and MacTools. These are co-sponsors of ours in the tool space. The entirety of the trial, Your Honor, if you look at the entirety of Mr. Sachs' testimony, virtually every page in the excerpts of record explains the need for control and the absolute disaster that would result if Monster cannot control its licensees. And when you can't control a licensee, the record shows those licenses are canceled. We made a record, unlike the cases that were cited, unlike any of the other cases that are in the briefs. No case has the extensive record of ours where 40 license agreements were made of record. And every one of those licenses shows tight restrictions on the licensee. And that is the prerogative of a good trademark owner who wants to preserve the exclusivity of the mark so that it signifies what the company believes it should be. And that was explained in detail by Mr. Sachs. What is the disaster that has existed as a result of the infringement by this defendant? The disaster is, and if you look at the summer 2018 catalog, which is in the excerpts of record, it's at ER 1083. The disaster is we have a company called Monster who is selling goods, every conceivable type of good, in areas that we do license. Even, in fact, when it comes to the gloves, they get their gloves made by the same company that we license. So just imagine licensees out there seeing goods in the marketplace where there's no royalty being paid, where there's no control. An independent supply network is now selling refrigerators, tumblers, glasses, things that are directly in the drink area. And we, of course, being the leading energy drink manufacturer in the country, it is the worst case scenario for any trademark holder to be facing an undisputed infringer. Someone who doesn't even challenge the likelihood of confusion, knows there's confusion. The evidence is abundant that there was confusion. There was actual confusion. We even brought in three mechanics who were confused. We did a trademark survey with 24% likelihood of confusion, and that is way higher than this court found was sufficient in the Adidas case. If you read Adidas, it shows that our evidence is overwhelming, even compared to Adidas. Adidas was a great case in 2018 that was subsequent to eBay and Herb Reed. Herb Reed, I think the court was somewhat misled, thinking that you can't rely on confusion alone. Well, that's true. We're not relying on confusion alone. What we're relying upon is the fact that we've lost control and that we have spent almost 20 years exercising, excruciating control. And I asked the court to look at Exhibit 80, the Cytosports Agreement. This is an agreement which I think really tells a lot. Here's an example where the district court thought it was a license agreement, that we somehow permitted usage of the mark. Not true. Cytosport, which is at ER 394 to 440. The exhibits. Look at the exhibits of that agreement. Here's an agreement where we had to sue, get a preliminary injunction, post a bond of $1.3 million, and then we had to figure out a way to disassociate, to make sure there is no confusion between the defendant and Monster. Great effort, 20 years of effort, over $5 billion undisputed in marketing and promotion of the Monster name. And to think, we now are at the mercy of an undisputed infringer. And we had to bring suit again. We are now on the district court again because the infringement is ongoing. And they are expanding. And if you look at the catalogs, every year they are expanding and they are using. Here's the real harm. They are using the denial of the permanent injunction as if it's some sort of license to continue to use. To continue to expand. To continue to cause confusion. The harm could not be worse. And the cases cited by the district court are cases where the record is paltry. The two cases the district court cited were contemporaneous with Herb Reed, where the plaintiffs did not make a thorough record of harm. Here we did. And there are numerous citations to Mr. Saxe's testimony that this would kill the mark. Once you lose control over who gets to use the mark, you no longer get to control what your reputation is, who your consuming audience is, what your mark means. That's the whole point of the trademark. And this case has, the entirety of the trial was to show our extensive presence in the automotive and tool field through our license agreements. And these licensees either pay us or we have an arrangement where they sponsor us. The best example of that, where we control, is the NASCAR. NASCAR, the biggest racing event in the United States, 38 races televised every weekend in the United States. We are the nine figure sponsor of that race. And NASCAR wants to sell monster energy products. But look what we make them do. We control every product, every quantity, every logo placement, the trade channels. You can't buy these at retail. You have to go to the event or go on the website of the event itself in order to buy our goods. That is the ultimate in control. Control the trade channel, control the quantities, control the distributor. We even control the price to the extent that we have minimum royalties so that the prices don't lower. An ongoing infringer who is completely free to sell whatever they want is the absolute worst harm any famous trademark holder could encounter. And then to add insult to injury, the district court found we had no standing under state law and citing only class action lawsuits on false advertising. Totally irrelevant. Obviously a trademark holder who owns the registrations is free to assert their marks. And this is why I also think the jury we appealed, the jury verdict of no damages, is also completely unsupported. And there is no evidence to suggest that we would ever license a commercial license to someone like ISN, Independent Supply Network, a free, a royalty-free license. So we appealed that judgment of no compensatory damages. And I see I have four and a half minutes. I'd like to reserve the cross-appeal. Amber Butler, thank you, Your Honor. All right. Thank you. Go ahead, counsel. Okay. Thank you. May it please the court. My name is Chris Mattel on behalf of ISN. Nearly every argument that you just heard was presented to and rejected by the jury in the district court in this case. Our arguments in the district court and now before this court really boil down to this. Because the jury made three explicit factual findings, providing any relief to Monster Energy would violate multiple rules of law, including the Constitution. And those three findings, no injury, no causation, no actual damages. And we believe that the district court's errors flow from its implicit rejection or one or more of those. But since Mr. Ray started out with the injury, let me just begin there. At trial, Monster Energy presented five of its employees. Actually, four of them were current employees and one was a former. Those employees, the senior marketing people, all testified that they experienced no actual confusion with ISN's products. The senior VP of finance for Monster Energy said he could not point to any lost sale due to my client's conduct. The CEO, who you just heard a lot about, specifically testified. I asked him on cross-examination, can you point to one can of your drinks that you lost because of my client's conduct? He said, I cannot. In fact, the majority of their witnesses, and I believe it was four of them except for Mr. Sachs, didn't even know who ISN was prior to this lawsuit. In fact, counsel is still getting our name wrong. It's integrated supply network, not independent supply network. This is the problem that we were facing. Nobody at Monster Energy had any clue who we were, and this was where we zeroed in our defense to say that there was no injury in this case. It worked. It worked. The jury found zero damages, no injury, no causation. We then cited to the district court, and we've done the same to your honors, the Acosta versus City of Cosa Mesa case. Where this court has held that when legal claims are tried to a jury, and equitable claims are tried to a judge, and they're on the same facts, the Seventh Amendment requires the district court to follow the jury's implicit and explicit factual findings. The district court didn't cite that decision, and it reached its own conclusion based on the evidence with respect to the injunctive relief. Does this mean that your client doesn't keep infringing forever? I mean, your client is infringing. The jury did find that. And they continue to infringe. How can Monster stop them? Well, with Judge Bolton, two things on that. Number one, they have sued us again, and that case has stayed because the district court judge recognized that Judge Marshall held that injury is not required in order to sue somebody for trademark infringement. So, number one, we believe that they don't have any standing, and the case should be vacated on that basis alone. But number two, we have dramatically changed that mark. Their biggest complaint was that we had Monster in a very, very big font and Mobile down below. We have changed all of that, and we have presented that to the district court before the grant of permanent injunction, and it was still denied. So, we don't believe that even with our resulting changes that there's any infringement. But when you go to the standing analysis here, they don't have standing. And this is one of the issues that we have with Monster Energy is that they keep saying that the standing analysis is confined just to the pleading stage. But Justice Scalia in both the Lujan and the Lewis decisions said standing is a stairs. It's a threshold requirement on pleadings. Then you go to summary judgment. But then you actually must proffer evidence and present it at trial. And in the Lexmark decision, which coincidentally Justice Scalia also wrote, that was 1125A claim where he said you have to show proximate causation. In fact, the parties agreed that proximate causation was required for an 1125A claim. And here, there was none. Zero. There's no injunctive relief. There is no irreparable injury. There is zero injury here whatsoever. So, our contention is that everything, the punitive damages award, the attorney's fees award, should be vacated in its entirety and sent back for judgment in favor of ISN on the basis of standing. I have another question. Yes. It appears that while this case has been on appeal, there's been a change in the law with respect to disgorgement. Specifically, the Supreme Court's decision in Romag Fasteners.  And the parties assumed that the Stone Creek case applied because it was Ninth Circuit precedent at the time. Should we not be remanding for consideration of disgorgement in light of the Romag Fasteners decision? Your Honor, first of all, this court, like every other circuit, requires an objection to a jury instruction in order to preserve something on appeal. We specifically agreed to that jury instruction. And you can see that we talked about that at our brief page at docket 18 at page 34. We said that this has been waived. And if you look at Monster Energy's response to that, they literally said nothing on it. In fact, the record says, and I'm reading from Monster Energy's counsel, and they were all there for this. Willfulness is a prerequisite to disgorgement. And the parties agreed upon instruction regarding disgorge profits reflects that. Well, because that was based on the state of the law at the time. I think that concession was reasonable, but now the landscape has completely changed. Right, but the CB case then, as well as a case that literally just came down 10 days ago by this court with respect to a change of law in a criminal case, says that if there's not an objection, the plain error standard of review applies. And in that criminal case, Judge Watford, I'm talking about United States v. Johnson, in that case, the Supreme Court changed the standard with respect to a felon in possession and the knowledge requirement for a felon in possession. It was Ratliff, I don't know how to pronounce it, Ratliff v. United States. And Judge Watford in that case held that the third prong of the plain error analysis, which you have to show that if their substantial rights were affected, the defendant must offer a plausible basis for concluding that an error-free retrial might end more favorably. Now in CB, the Ninth Circuit on Bonk v. City of Sonora said that the civil standard is higher than the criminal case. You have to show the pinnacle of a miscarriage of justice. Pinnacle was used in that case, it was pinnacle of fault, miscarriage of justice. And in this case, they have the burden of showing that the result would be different. If you look at the law with respect to Lindy or anything else with respect to any trademark infringement case in this circuit, you have to show the fact of injury and you have to show causation in order to get there. You can't just come in and say, I want trademark infringement and then I get a disgorgement of profits. Otherwise, anybody could sue for McDonald's marks and say, I get your profits for trademark infringement on McDonald's. You have to show a particularized, concrete injury. That's what Spokio says and that's what Lexmark says. And in this case, we show that the result would not be different. They have not carried their burden of showing that they had any injury. And we talked about this exact standard was in the Digby-Adler court case where the court held that Digby must show some evidence of injury as a result of defendant's conduct before it can recover defendant's ill-gotten profits. Where is the injury here? We sell high-end tools to auto mechanics out of big box trucks. We don't sell drinks. I said in my opening statement, you don't drink a wrench. The jury believed that with respect to not only the fact of injury and causation, it is just missing. There would not be a different result here. And Monster Energy has the burden of showing the plain error review applies and that their substantial rights were violated. And if you go to that CB case, can you honestly say that the change in law is the pinnacle of fault when a criminal defendant in that case was not given a new trial based upon the change of law that the Supreme Court did on the knowledge requirement for a felon in possession? If I could address then as well punitive damages. Your honors know, it's been extensively cited here, this California versus Altus finance case, which says that an award of compensatory damages, even if nominal, is required for punitive damages under California statute 3294 of the civil code. Here, the jury came back with zero. They actually wrote the number zero and then they wrote in all caps, the word zero next to that in case there was any confusion. But then they did award the $5 million. The district court, after the trial was done, increased that damages award from zero to $1 specifically in order to save the $5 million punitive damages award. We contend that that was error for three reasons. First, the district court's reliance was almost exclusively upon section 1983 cases. But in this court, as held in Floyd versus law, that because of the special nature of 1983 litigation, because it is a constitutional deprivation of rights, that if a finding of section 1983 is found, then it is mandated. Nominal damages are required in a case like that. The only other case that they relied upon was the Les Bruns versus city of Spokane case, which was an employment retaliation and constructive discharge case. But there, nobody objected to the nominal damages going from zero to $100. We certainly have objected to that here. And what the district court did, even by giving that dollar, is it ignored the jury's findings of no injury and no causation with literally no analysis. Zero analysis that was done on that. We believe that that zero should stand, and therefore, under California versus Altus Finance, that entire punitive damages award should be vacated. In addition to that, the State Farm Mutual Automobile Insurance Company versus Campbell case specifically says that punitive damages can only be awarded after an award of compensatory damages. So we've got a win here with respect to California versus Altus Finance, and we have a win with respect to the Campbell case. Now, if you go beyond that, let's assume, just for the sake of argument, that that $1 was okay, that this court is going to permit the zero, it's okay for the district court to award that $1. Then you have to go to the BMW versus Gore factors. You know those factors. I'm not going to start restating them, but if you look at the degree of reprehensibility, the punitive damages that the district court found was on the basis of one email. One email string. And what happened in that email string in 2016 was that employee one at ISN recognized that Monster Energy was sponsoring NASCAR. Employee two then said, well, that certainly creates awareness. And then the chief executive officer of ISN responded with a smiley face. That's it. And that was in 2016. But we began using the mark in 2010 for six years prior to that. And on top of that, the jury did not find any willfulness. That was emblematic as part of that. That degree of reprehensibility here with the smiley face is, I believe, a factor that goes in our favor. The second factor, when you ask yourself about the disparity of harm, that depends upon whether or not you permit the zero or the $1. If it's zero, it's $5 million. If it's one, then it's $1 short of $5 million. And then the third factor, which generally looks at that ratio analysis. We know that the Supreme Court has said anything above 9 to 1 is constitutionally suspect. But in this case, we cited five decisions from this court that remanded for below a 10 to 1 ratio punitive to compensatory damages. Monster Energy did not even cite one of them. They didn't even try to distinguish any of them. We cited some specific farming where there was serious and intentional commercial fraud. And in that case, they found that a 31 to 1 ratio violated due process. We're talking about 5 million to 1. Hold on a second. If, in fact, nominal damages are appropriate, we'll just assume for a minute that changing the zero to $1 was okay. Using the ratio test on nominal damages doesn't make any sense. Because even if they had awarded $10 in punitive damages, that would be 10 times that suspect. And the whole idea, looking at 1983 cases, is that you can have nominal damages in the absence of actual damages. And then you look at the reprehensibility of the conduct and punitive damages can be awarded. Now, maybe 5 million is just qualitatively too much. But I don't see the utility of looking at a ratio when the ratio is compared to $1 of nominal damages. Judge Fulton, I understand where you're driving at. When you're really talking about 1 is 9, is $20,000, when you're looking at a ratio on that, it's really not that much money. So we're looking more at a qualitative analysis rather than a quantitative analysis. And I understand your point. The point, though, here, though, is that even if you look at BMW of North America versus Gore, in that case there was a $2 million punitive damages award on $4,000, and the Supreme Court said that went back. Those ratios are necessary in order to benchmark against other cases, in order to at least see how much is reasonable with respect to this. And where I would respectfully disagree with the District Court is that when you're talking about Section 1983 cases, we're talking about people whose Fourth Amendment, Fifth Amendment, Sixth Amendment rights have been violated by law enforcement. That is just simply not akin to a trademark infringement by, admittedly, somebody that's spending billions of dollars on their advertising. And in fact, this Court has also held that there's a ratio slightly greater than 10 to 1 in Southern Union, and they reduced it to 3 to 1 because they held that any harm caused was not to some poor, struggling person. It was inflicted upon a very large company. We are peanuts as compared to Monster Energy Corporation. We are a small company in Florida that right now is furloughing people because of COVID. The idea that we can absorb $5 million is wrong. This is an extremely serious issue for my company and my client. They cannot afford this. So when we're talking about this degree of reprehensibility and if we're going to go beyond that ratio analysis, which I think the Supreme Court fairly requires, but if we look at that and we look at what somebody can actually afford, we're talking something here in the low six figures right now. And frankly, any money that goes to Monster Energy right now is likely going to result in even more employees being let go. Unfortunately, that's just the reality right now. But when you look at... One additional question that I would ask were I you is that if I would say, okay, well, listen, you're talking the entire time here about you should be respecting the jury's decision with respect to lack of injury and lack of causation, but now you're saying we should vacate the punitive damages award. The one thing that I would just remind your honors, and I'm sure you know this, but the Supreme Court's decision in Cooper Industries versus Leatherman Tool Group specifically holds that unlike compensatory damages, which are a finding of fact, the Supreme Court has held that punitive damages are not. And they are subject to your analysis and they're subject to your review. And that's 532 U.S. at 437. We cited this in our papers, but you do not need to apply a clearly erroneous standard to that finding of punitive damages with respect to that. So finally, with respect to our request, if you go and judge Bolton, and I understand, you know, when I very much respect a court of appeals saying, listen, I wasn't there, you know, and maybe $1 was right in order to save the $5 million. I understand that. But the jury's finding here under Acosta was zero. There was no injury. There was no causation. And we cited the D.C. Circuit and 10th Circuit decisions post-trial dismissing entire cases for lack of standing because somebody didn't show an injury. So if we're going to go here that there was zero awarded by the jury, add that to Acosta, add that to what the district court found about no irreparable injury whatsoever. And the district court, by the way, relied a lot on that San Miguel decision of this court, which they actually granted summary judgment of infringement. And the jury came back with zero. The district court then awarded a permanent injunction. And this court reversed that permanent injunction. So, I mean, that case is extremely close to this case, you know, but again, Monster Energy didn't even address it any place in there. The district court did, we did, and Monster Energy didn't. But then if you add that standing and you add that 10th Circuit and the D.C. Circuit, the result is they have no injury and no causation. This case should be vacated and judgment should be entered in favor of my client. They haven't proven anything. I know that they're big. I know that they spent a lot of money. I heard about it a lot at trial over and over and over again. So did the jury. It did not work. They lost. We won. And what I would ask this court to do is to correct this error with respect to the punitive damages. And then finally, the attorney's fees that was awarded. This one, the jury award went from zero to one to save punitive damages. The only way you could get punitive damages in this case was 3294 of the civil code. The Lanham Act does not provide for punitive damages. There was no finding of willfulness. There was no injunctive relief ordered. So Monster Energy literally got zero relief with respect to its Lanham Act claim, but the district court found under Octane Fitness that this was an exceptional case that merited attorney's fees against my client. I would stipulate that it's exceptional. It's exceptionally bad for Monster Energy, but this is not something that mandates attorney's fees that my client should have to pay. I have nothing further unless the court has questions. All right. Thank you, counsel. Mr. Ray, you have some rebuttal time. Thank you. First of all, they lost on the argument that the jury somehow makes any findings concerning equity, and the records are different. The jury does not decide irreparable harm. So the jury also never found no injury. I believe he's also disregarding the case law that you don't need to be competitors. I gave the Safeway case as an example of the Ninth Circuit in 1957. There's no response. You don't need to have lost sales. They don't sell energy drinks. That's not the point. I cannot put a Starbucks label on the back of my chair. That's not permissible under the trademark law. Judge Bolton, you did not get an answer to your question. They obviously treat the denial of the injunction as a license, as if they're free to do what they want. The fact that they're peanuts and that we have no clue who they are is precisely the fear we have. They are not a company of great repute like Stanley and DeWalt and MacTools. And other companies that we've associated with. I also want, I think the problem that counsel is having is he is inappropriately using false advertising standards. Cases where parties sue on behalf of the public. Those are cases where you need to show injury and causation for standing. Those were the cases the district court wrongly cited in her state law no standing holding. But counsel is picking and choosing what he likes and dislikes from the district court. The district court on ER 6 explicitly rejected his Lexmark argument. Lexmark was a false advertising case. And you can see in false advertising cases when members of the public, usually on behalf of a class, claim they can sue when they see a billboard that might be false. That's not the case here. We have the registered owner of the registered trademarks who obviously has standing. And so the standing argument is truly frivolous. And the district court only fought it with respect to the state law claim because of Prop 64. But Prop 64 was to prevent class action suits from lawyers bringing them on behalf of public rights. And I believe we have a nice discussion in our brief. The difference between public and private rights as explained by Justice Thomas in the Spokio case. I'm very familiar with Spokio. But Spokio also is a case where someone just feels they have standing and you don't know if they are the right plaintiff. Standing worries about who is the right plaintiff to bring the case. Is there any doubt that Monster is the right plaintiff to bring this case? Mr. Mattel has never explained who else might have standing to prevent an undisputed infringement. Also, Mr. Mattel picks and chooses from the district court opinion as if the district court mentioned every piece of evidence. Putative damages were awarded because the defendants repeatedly lied. They lied to the Chinese authorities. They lied to the U.S. Patent and Trademark Office. They repeatedly lied to us as we tried to investigate how they were using the mark. The preliminary question though is, does California law require a showing of actual damages or punitive damages to be awarded because there were no actual damages? Number one, no. Nominal damages are sufficient. And Mr. Mattel correctly pointed out that the district court gave nominal damages so that the punitive damages could be sustained. There's no question the district court has the authority and discretion to add nominal damages. We cited a case that Mr. Mattel did not talk about where the appellate court even awarded punitive damages. The appellate courts even have the authority to award nominal damages on appeal. So certainly it's not waivable before the jury. Romack discussion. I don't understand why there's any debate that of course you get the benefit of the change in the law and for this reason the punitive damages issue at a minimum can be remanded once there is a final judgment on all the economics which include attorney's fees. The ratio also includes attorney's fees and potential harm, something my good friend has not addressed. So with that said, I see my time is up. I thank the panel.  Thank you, Your Honor. Thank you very much, counsel, to both sides of your argument in this case. A lot of issues for us to address. I'll order the case admitted and we'll issue a ruling in due course. That concludes our argument calendar for today and we're in recess until tomorrow morning.
judges: Fernandez, Nguyen, Bolton